CLARENCE W. WOODRING ET AL., EXECUTORS, APPELLEES, V.
HERMAN SEIBOLD, APPELLANT: CLARA W. HICKS ET AL.,
APPELLEES.

287 N. W. 75

FILED JULY 18, 1939.  No. 30498.

*Butler & James* and *Frank B. Morrison,* for appellant.

*Fred J. Schroeder* and *Perry, Van Pelt & Marti, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE,
CARTER, MESSMORE and JOHNSEN, JJ.

SIMMONS, C. J.

This is an action to set aside a deed to certain real estate
and personal property.  The plaintiffs are the executors of
the estate of Amanda Barry, deceased.  The defendants are
the grantee in the deed, Herman Seibold, and a sister and
nieces and nephews, heirs at law of the deceased.  While the
action is brought nominally in the name of the executors, it
is actually a contest between the heirs at law and the de-
fendant Seibold.  All parties except the defendant Seibold
will be referred to as the plaintiffs.  The trial court found
for the plaintiffs and against the defendant Seibold.  The
defendant Herman Seibold appeals.  The insufficiency of
the evidence to support the verdict is the principal assign-
ment of error.

Plaintiffs charge generally that the deed was without
consideration, that Amanda Barry was incompetent because
of old age and physical and mental disease, and that the
defendant occupied a position of trust and confidence with
Amanda Barry, and that the deed was given as a result of

a violation of his trust and undue influence on the part of the defendant.

The record in this case is 500 pages of testimony and numerous exhibits. We have read the record in its entirety and checked the citations of the evidence in the briefs against the record. In many particulars the record does not sustain plaintiffs' statements as to the evidence. Plaintiffs' witnesses are largely those who have benefited from Mrs. Barry's bounty and who are interested in the success of this action. Defendant's witnesses are largely those not interested in the outcome of this litigation.

Amanda Barry was a pioneer of southwestern Nebraska. She inherited a considerable estate from her husband. For almost thirty years after his death she managed her farms and ranch properties efficiently, and arrived at old age possessed of considerable real and personal property. She had neither living children nor direct descendants. There were sisters, nieces and nephews living outside of Nebraska, and a stepdaughter living nearby in Nebraska. When she was 83 years old, and her competency not questioned, she made a will providing bequests for the stepdaughter, her sisters and friends. These bequests were for sums as high as $10,000 to each of two sisters, and ranging down to sums of a few hundred dollars to others. The will contained a provision giving $2,000 to a neighbor and employee "for faithful services and attention during the past." She provided that, if her estate was insufficient to pay the bequests, all bequests be prorated, and that if any advancements were made during her lifetime they be deducted from the bequests. By codicil dated November 24, 1934, she changed the bequests somewhat, increasing some of the bequests, and increasing the number of beneficiaries. She revoked the bequest to the neighbor and former employee, changed her proposed executors and affirmed the provisions of her prior will not specifically altered or revoked by the codicil.

By codicil dated October 10, 1935, she made certain changes in the bequests, reducing legacies to those not her

heirs, devised specific real estate to certain beneficiaries, named other beneficiaries, again bequeathed the sum of $2,000 to the former employee "for his faithful services to me," and devised to the defendant, "who is working for me at the present time," the land involved in this action, "together with all personal property belonging to said farm, except the live stock." She next provided: "It is my will that those whom I shall pay off in full according to my will during my lifetime, shall not share any more whatever in my estate." She nominated new executors and affirmed the provisions of her will and first codicil as to all parts not revoked or altered.

Thereafter, on October 25, 1935, by warranty deed she conveyed to the defendant the farm described in the codicil of October 10, 1935, "together with all personal property upon and belonging to said farm, except the live stock, reserving however to this grantor the income from said farm during the lifetime of this grantor." The recited consideration was $1 in hand paid "and faithful services rendered to the undersigned grantor." The actual payment of the $1 is proved. This deed was recorded October 26, 1935. This action is to set aside this deed.

On November 7, 1935, she issued a check for $10,000 to a beneficiary named in the October, 1935, codicil "for inheritance," and on November 25, 1935, conveyed certain real estate to the same beneficiary.

January 10, 1936, she caused to be delivered to a sister, one of the plaintiffs, government bonds valued at $4,000 "as part of inheritance," and on June 19, 1936, conveyed to said sister plaintiff certain real estate, the deed reciting "The purpose of this deed conveys to Clara W. Hicks her part share of my estate and I am to retain a life estate in and to said premises during my natural life." On October 6, 1936, she further gave this sister a check for $745.85 for a "new car." In March, 1936, she issued a total of $13,000 in checks to six of the plaintiffs for "inheritance," and delivered $1,000 in bonds to a witness for the plaintiffs, who was an old friend.

Amanda Barry died in 1937. Her estate at the time of her death is probably insufficient to pay costs of probate and all specific bequests.

Mrs. Barry disposed of some of her personal property while living; she reserved a life estate in the real property conveyed. So far as this record of the distribution of her estate is concerned, it shows the carrying out of a natural, normal desire of an old lady to distribute her estate among relatives, friends and employees.

There is some evidence of forgetfulness and illness prior to 1935. For some years after the death of her husband Mrs. Barry lived on the property involved in this action, which was her home. Later she spent a winter or two in California, and lived with friends near her home in the summer months. In 1932 she met the defendant, a brother-in-law of the former employee. The defendant became first a part time, and from 1935 a full time, employee of Mrs. Barry. The defendant was a young unmarried man in his middle thirties. Shortly after meeting the defendant, Mrs. Barry moved to a residence in Curtis where she had friends, and still later in 1935 returned to her ranch home to live. Her desire to live alone and to return to her ranch home is a natural one. The plaintiffs charge that from the time she moved to Curtis she was under the dominance and control of the defendant, and that he assumed complete control of her and her property, and was actuated by the sole purpose of gaining possession and ownership of her property. There is nothing in this record indicating that his services as an employee were inefficient or unsatisfactory. Mrs. Barry was not as active as formerly. She found difficulty in writing. He performed many services for her, and not only took care of her farm operations and her home, but also attended to many business transactions for her. Some time prior to the delivery of the deed in question she gave him a general power of attorney. The facts with reference to the making of the power of attorney are not shown. The record does not disclose that he ever used the power of attorney improperly, or ever profited from its use. He

used it a few times in writing checks for the payment of the expenses of the farm, and in payment of wages to himself. Her bank account often was several thousand dollars, yet defendant did not use the power of attorney to improperly withdraw any funds, unless it can be said that the unexplained raise in wages was an improper exercise of his power of attorney. Beginning in January of 1936 his wages were increased from $45 to $55 a month. This increase is not explained, but is a natural increase to a satisfactory employee. The checks for wages were made out by the defendant and signed by Mrs. Barry until July, 1936. Thereafter she signed three of the checks, and the remainder were signed "Amanda Barry by Herman Seibold." It may be assumed that he wrote, Mrs. Barry signed, and the defendant assisted in the delivery of checks totaling $23,000 to the various beneficiaries. No complaint is made that the defendant interfered with or profited by the payment of those sums; on the contrary, there is evidence that he advised and encouraged it. Defendant was Mrs. Barry's agent in the delivery of the bonds, and assisted her in making conveyances of real estate to the beneficiaries under her will. Defendant was with Mrs. Barry when she sold bonds, and secured the money with which to make the advancements that were made. The inventory of Mrs. Barry's estate shows that she had $11,211.06 "cash in bank" at the time of her death. In assisting in the handling of all of these matters there is no charge that the defendant personally profited or misappropriated any of Mrs. Barry's personal property. There is evidence from disinterested witnesses that Mrs. Barry expressed appreciation of the defendant's services, his care of her, and that she was going to do handsomely by him because of it.

It should be noted that, while the defendant had access to bonds and intangibles and power of attorney covering her bank account, the property which he is charged with having improperly received from her is land and tangible farm property, no part of which could be hidden, or easily disposed of, or moved away.

The will and the first codicil were in the hands of a relative in Iowa prior to the summer of 1935. Mrs. Barry was living at home and had a maid, who later was adjudged insane and did not testify. The maid contacted Mr. L. H. Cheney, an attorney of McCook, and asked him to stop by the Barry home the next time he went to Stockville. He was also contacted by the defendant. He never received a direct request from Mrs. Barry to come, although when he did do so she apparently knew of his coming and talked with him about changing her will. Although he had known her since 1891 he had never been her attorney. He had furnished Mrs. Barry her executrix' bond when her husband's estate was being probated. Her attorney had been Mr. J. A. Williams of Stockville, and he was deceased prior to 1935. Mr. Cheney apparently had been the attorney for the maid. He did not know the defendant prior to 1935. Mr. Cheney called at one time in the summer, found Mrs. Barry at home and ill, talked with her about her will. She was not then ready to designate the changes to be made in it. Mr. Cheney did not think her able at that time to change it. There is testimony indicating that Mr. Cheney thought her incompetent at that time to make a will, although the record does not show what the basis of that opinion was, except that she was sick and did not have the changes definitely in mind. Either at that time or subsequently he suggested that she write out the provisions that she wanted in the will and bring the memorandum to him. This was done. In the meantime Mr. Cheney wrote for the will and after some delay the Iowa relative brought it to him, so that he had it for reference when the second codicil was prepared. The memorandum is in evidence in her handwriting, showing 19 proposed bequests ranging up to $10,-000, and including the defendant's bequest. Plaintiffs contend that the defendant and the maid prepared the changes and then had Mrs. Barry copy it. There is some questionable evidence that later the maid admitted that was done. Mrs. Barry was taken to McCook by the maid, the defendant and others. The testimony shows that she had difficulty

in traveling alone. The defendant made the appointment for her with Mr. Cheney. Defendant was not with Mr. Cheney and Mrs. Barry while they discussed each item with Mrs. Barry and prepared the codicil October 10, 1935. After it was first written Mrs. Barry returned, had the codicil changed so as to increase the bequest to the stepdaughter and the codicil was executed in due form. Mr. Cheney, his secretary and others testify that at that time she was competent, knew the changes which she wanted made, knew her property and to whom she wanted it to pass upon her death.

Thereafter on October 25, 1935, she was brought to McCook again by the defendant and had Mr. Cheney prepare the deed to the defendant. No one who had any connection with either of these transactions indicates any serious doubt of her complete competency and understanding and free-will action on both of these days. The defendant, while present in McCook, was not present in Mr. Cheney's office when the codicil and deed were prepared.

Subsequent to her death the will and the first and second codicils were contested and on appeal were admitted to probate with the exception of the paragraph devising the property to the defendant. By stipulation of all the parties that paragraph was not admitted to probate. Permission was given the heirs to employ counsel and to bring an action to set the deed aside in the name of the executors. The failure to probate the one paragraph was to be without prejudice to the rights of plaintiffs and defendants in said action. Mr. L. H. Cheney and his son are representing the executors in the probate of the estate in all matters except this litigation. In view of the probate of the will and both codicils it must be conceded that all of the parties to this action believed that Mrs. Barry was competent to make the will and codicils and dispose of her property by those instruments. The evidence of her competency otherwise is convincing.

Mrs. Barry's banker testified that the defendant in the fall of 1935 told him that he had a power of attorney and that it was difficult for her to transact business. The banker

testified that the defendant usually came with Mrs. Barry to the bank, once or twice her sister was with her; that on one occasion she came in, asked defendant what she was there for, the defendant told her she intended to sell some bonds; that Mrs. Barry appeared not interested; that it was in his opinion possible for a person to dominate her to some extent and to determine her actions; that he did not at those times consider her incompetent to transact ordinary business. The record shows that subsequent to the time the deed here in question was executed the banker sold several thousand dollars worth of securities for Mrs. Barry; that the money was put to the credit of her account and the bank paid the checks, largely to the beneficiaries, drawn against the account.

Two doctors who treated her testified that during that period she was unusually keen and competent, and testified to the facts upon which their opinion was based. Neighbors, friends and employees testify to the same extent covering the entire period. While there is some testimony to the contrary, it is largely based on isolated instances. Those disinterested parties who assisted her in the conveyance of other property testify to her competence. We cannot extend this opinion by a recital of the testimony. The evidence as to her competency to dispose of her property is convincing.

Is there evidence of undue influence? It must be conceded that the defendant had the opportunity to exercise an influence over Mrs. Barry. The record, however, does not establish that undue influence was exercised. As we have pointed out every act of Mrs. Barry, in disposing of her property, including that to the defendant, fits into the general scheme of an old lady desiring to distribute her property during her lifetime and by will. In September, 1935, she told an old friend of her plans for the distribution of her property, along the lines subsequently followed. She provided generously for her sister and her sister's children, she remembered old friends, she bequeathed $2,000 to the former employee who apparently had previously been fully

paid the contract wages for his services. Prior and subsequent to this deed the defendant was fully paid the contract wage for his services. The extra bounty that she gave him, while large in itself, is not large in comparison with the gifts to the former employee or to others who had rendered no services to her and who were not with her in her declining years. Defendant after receiving the deed continued for 23 months to perform every service requested during her lifetime.

On November 26, 1935, just a month after he received the deed, the defendant wrote the plaintiff sister, Mrs. Wicks, advising her that Mrs. Barry wanted her to come to see her once more and "to have your share of inheritance by your own choice in either land or cash, $10,000. Mrs. Barry has decided to divide her property up while alive according to her 'will' to spare her heirs any trouble and hard feeling after her death. She is reserving however the whole income of her farm for herself and her estate even if she is giving deeds to certain parts of her farm to her heirs while alive. She already has given Ella M. Johnston $10,000 and her Curtis property. She also has given to me the quarter where we live and the next joining north. Now I wish that you and Ira would come down to see and find out for yourself how I am running Mrs. Barry's affairs and what dirty robber I am supposed to be. She has also given to Grace Chitwood McConnville's two boys their share in land, not part of her home farm. * * * Mrs. Barry is feeling fairly well, physically, but is failing slowly, her vitality is giving out. She is up every day, but mostly on the couch. Her appetite is pretty good. Will close for this time in the hope of seeing you soon." We do not see in this letter any evidence of a scheming, conniving individual. If he were, why would he invite in the sister to get her inheritance, to find out for herself what was going on and tell her of Mrs. Barry's gifts, *including the one he had received?* In response to that letter, the sister came and remained with Mrs. Barry until her death. The sister testified to a somewhat theatrical story about the defendant's

power over Mrs. Barry and that Mrs. Barry was practically a prisoner in her own home. Parts of her story are positively disproved by a nurse and a doctor. The antagonism of the sister to defendant seems to be based upon her contention that the defendant persuaded her to accept land as a part of her inheritance, and that she would have been better provided for had she taken all cash.

This sister remained in the home of Mrs. Barry until the latter's death. During that time she accepted securities and lands and evidently thought that Mrs. Barry was fully competent to bestow them upon her and was not influenced improperly in so doing. She assisted in mailing out the checks to others who also received their inheritance.

The evidence of undue influence comes largely from interested witnesses and is not convincing. We shall not extend this opinion by specific reference to it further.

In *Gidley v. Gidley*, 130 Neb. 419, 265 N. W. 245, this court held:

"1. The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the will of the grantor.

"2. Undue influence exercised by any one, whether he or another gains by its exercise, renders the will or other instrument thus procured worthless.

"3. A case of undue influence is made out where it is shown by clear and satisfactory evidence (1) that the testator or grantor was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; (4) that the result appears to be the effect of such influence."

Applying the above rules to the instant case, there is no clear and satisfactory evidence (1) that Mrs. Barry was subject to such influence; (2) the opportunity to exercise the influence existed; (3) a disposition to exercise such influence is not clearly or satisfactorily shown; (4) the deed to the defendant does not appear to be the result of such undue influence, but, as we have pointed out, is the result of the execution of a plan for the distribution of all

of Mrs. Barry's property, which is one quite often followed by people of advanced years. See, also, *Little v. Curson,* 114 Neb. 752, 209 N. W. 737.

Courts should not set aside the disposition of property made by will or deed without good reasons, based upon clear and satisfactory proof.

Appellees contend that a fiduciary relationship existed between Mrs. Barry and the defendant, and that because thereof the burden of proof shifted from the plaintiffs to the defendant, and that the defendant had the burden of establishing that the deed to him was untainted by undue influence. This court held in *Gidley v. Gidley, supra,* that under certain circumstances the burden might be cast upon the grantee to make such a showing. The more accurate statement of the rule is that, where a fiduciary relationship is shown to exist, under certain circumstances a presumption of undue influence arises, and the grantee is required to produce evidence to overcome that presumption. Assuming that this case calls for an application of that rule, it is clear that the defendant has met the burden in that regard.

Appellees further contend that it amounts to a constructive fraud for the defendant, as the agent of Mrs. Barry under the power of attorney, to take title to her property.

We do not consider the rule applicable in this case. The power of attorney established a principal and agency relationship between Mrs. Barry and the defendant, which was in existence at the time the deed in question was executed. The power was, in general terms, "to sign, execute and acknowledge any and all papers necessary to the transaction of my business affairs." It does not specifically refer to the conveyance of property. It was never so used. The power of attorney was not used in securing the deed in question. The deed did not result from the existence of the power of attorney, nor from the relationship created by that instrument. The deed was the result of a purpose independent from and not connected with the power of attorney. In the execution of that purpose, Mrs. Barry had the independent advice and assistance of an admittedly competent and

reputable lawyer. The transactions between a principal and agent that are viewed with suspicion and scrutinized carefully are those respecting the "subject-matter of the agency," where it is required that the agent act in entire good faith, and without any undue influence or imposition, and upon a full disclosure of the facts. The existence of the relation does not itself forbid transactions between the principal and agent. 2 C. J. 706; 3 C. J. S. 25, sec. 145.

Under the circumstances of this case, the existence of the power of attorney, and the relationship created thereby, do not prevent the application of the general rules announced in *Gidley v. Gidley, supra.*

The decree of the district court is reversed and the petition of the plaintiffs and the cross-petition of the defendant appellees is dismissed.

REVERSED AND DISMISSED.

CARTER, J., dissents.